13-0192-cv
*Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd., et al.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: April 17, 2013    Decided: July 16, 2013)

Docket No. 13-0192-cv

_____

BLUE WHALE CORPORATION,

*Plaintiff-Appellant*,

-v.-

GRAND CHINA SHIPPING DEVELOPMENT CO., LTD,
AKA SHANGHAI GRAND CHINA SHIPPING DEVELOPMENT CO., LTD.,
GRAND CHINA LOGISTICS HOLDING (GROUP) COMPANY LIMITED,
HNA GROUP CO. LTD.,

*Defendants-Appellees*.

_____

Before:
          POOLER, WESLEY, DRONEY, *Circuit Judges*.

    Plaintiff-Appellant Blue Whale Corporation ("Blue
Whale") appeals from the January 11, 2013 Order by the
United States District Court for the Southern District of
New York (Nathan, *J.*) vacating its prior Rule B maritime
attachment order against Defendant-Appellee HNA Group
Company, Ltd. ("HNA"). Contracting parties Blue Whale and
Defendant-Appellee Grand China Shipping Development Company,
Ltd. ("Development") are currently engaged in arbitration in
London to resolve a dispute that arose out of the parties'

maritime shipping contract.  In anticipation of an
arbitration award against Development, Blue Whale brought a
Rule B claim in the Southern District of New York against
Development's alleged alter ego, HNA, seeking to attach
approximately $1.3 million worth of HNA assets located in
New York.  The district court vacated the Rule B attachment
order after Defendants-Appellees challenged the sufficiency
of Blue Whale's alter-ego claim under Rule E(4)(f).  The
district court evaluated the prima facie validity of Blue
Whale's veil-piercing claim under English law, pursuant to
the choice-of-law provision in the charter party, and
determined that Blue Whale had insufficiently alleged that
HNA was an alter ego of Development.  Because we find that
Blue Whale's alter-ego claim was collateral to the
contractual dispute and that English law did not govern, we
apply federal maritime conflicts-of-law analysis to
determine the governing law.  Accordingly, we VACATE the
district court's order and REMAND with instructions to re-
evaluate the prima facie validity of Blue Whale's claim
under federal common law.

        VACATED AND REMANDED.

                    _____


        GEORGE M. CHALOS (Katherine N. Christodoulatos,
                Briton P. Sparkman, *on the brief*), Chalos &
                Co., P.C., Oyster Bay, NY, *for Plaintiff-
                Appellant*.

        THOMAS H. BELKNAP, JR. (W. Cameron Beard, Of
                Counsel, *on the brief*), Blank Rome LLP, New
                York, NY, *for Defendants-Appellees*.

        MICHAEL J. FREVOLA (Christopher R. Nolan, Warren
                E. Gluck, *on the brief*), Holland & Knight LLP,
                New York, NY, *for Amicus Curiae White Rosebay
                Shipping S.A.*

                    _____

2

1    WESLEY, *Circuit Judge*:

2         This admiralty law dispute arises from a distinctly

3    international transaction: a Chinese company contracted to

4    transport goods from Brazil to China aboard a Liberian

5    vessel.  The existence of so many foreign interests yields

6    an inherently federal choice-of-law question – one we

7    resolve via application of maritime conflicts-of-law

8    principles.

9

10                              **Background**

11        Plaintiff-Appellant Blue Whale Corporation ("Blue

12   Whale"), a foreign company,[1] entered into a charter party (a

13   maritime contract) with Defendant-Appellee Grand China

14   Shipping Development Company, Ltd. ("Development"), a

15   Chinese company, on May 25, 2011.  The charter party

16   provided for transport of 250,000 metric tons of iron ore

17   from Brazil to China aboard a Blue Whale vessel registered

18   in the republic of Liberia.  The contract purportedly

19   required Development to pay 98% of the total freight costs

---

[1] Throughout this litigation, Blue Whale is identified only as a "foreign corporation."  We note that Blue Whale lists a business address in Monrovia, Liberia, on a freight invoice issued to Defendant-Appellee Grand China Shipping Development Company, Ltd., and that at least one of Blue Whale's vessels is registered in Liberia.

3

1   to Blue Whale within seven days of loading the iron ore;
2   allegedly, Development failed to make this payment.  Blue
3   Whale therefore held the vessel and its contents until
4   Development satisfied the claimed debt, resulting in more
5   than $1 million in damages borne by Blue Whale.  Blue Whale
6   commenced arbitration against Development in London pursuant
7   to the charter party's clause specifying that "[a]ny
8   disputes arising under the Contract," if not settled
9   amicably, "shall be referred to arbitration in London [with]
10  British law to apply."  The arbitration is ongoing.
11          On March 26, 2012, Blue Whale filed a complaint in the
12  United States District Court for the Southern District of
13  New York seeking to attach property belonging to
14  Development's alleged alter ego, Defendant-Appellee HNA
15  Group Company, Ltd. ("HNA"), also a Chinese company, in
16  anticipation of a future arbitration award against
17  Development.  Rule B of the Supplemental Rules for Certain
18  Admiralty and Maritime Claims ("Rule B") allows plaintiffs
19  to seek an attachment of "defendant's tangible or intangible
20  personal property – up to the amount sued for – in the hands
21  of garnishees named in the process," "[i]f a defendant is
22  not found within the district" at the time the complaint is

4

filed.  FED. R. CIV. P. SUPP. R. B(1)(a).  Blue Whale alleged
that Development and HNA "are in fact a single business
enterprise" and that the district court should allow Blue
Whale to pierce the corporate veil to reach in-district HNA
assets of approximately $1.3 million.

On May 17, 2012, the district court (Nathan, *J.*) issued
an order authorizing attachment of HNA's holdings in third-
party Pacific American Corporation – a privately-held direct
subsidiary of HNA based in New York – in an amount up to
approximately $1.3 million.  HNA subsequently moved to
vacate the district court's maritime attachment order under
Rule E(4)(f), which provides that a person claiming interest
in attached property "shall be entitled to a prompt hearing
at which the plaintiff shall be required to show why the
arrest or attachment should not be vacated."  FED. R. CIV. P.
SUPP. R. E(4)(f).

Under Rule B, attachment is only appropriate if, *inter
alia*, the plaintiff has a valid prima facie admiralty claim
against the defendant.  Neither party disputed that Blue
Whale had alleged a claim sounding in admiralty and that the
court had maritime jurisdiction.  However, the parties
disagreed over what substantive body of law controlled

1  whether Blue Whale had alleged a valid prima facie claim to

2  pierce the corporate veil.  HNA argued that English law

3  governed pursuant to the charter party's choice-of-law

4  provision and that Blue Whale had failed to allege

5  sufficient facts to support a prima facie alter-ego claim.

6  In response, Blue Whale argued that federal common law

7  controlled the inquiry because Rule B is procedural in

8  nature and, in addition, because "it is well-settled that

9  'federal courts sitting in admiralty must apply federal

10  common law when examining corporate identity.'"[2]  Memorandum

11  of Law in Opposition to Motion to Vacate Maritime Rule B

12  Attachment, at 8-9, *Blue Whale Corp. v. Grand China Shipping*

13  *Dev. Co., Ltd., et al.*, No. 12 Civ. 02213 (AJN) (S.D.N.Y.

14  2012).

15      The district court separately analyzed the two elements

16  required for Blue Whale's claim: (1) whether the claim

17  sounded in admiralty; and (2) whether the claim was prima

18  facie valid.  First, the court held that whether Blue Whale

---

[2] Apparently, neither party raised the issue of whether HNA
(a non-signatory to the charter party between Blue Whale and
Development) could be bound by the English choice-of-law clause.
As the district court noted, there are cases that speak to this
issue and find that courts may force non-signatories to adhere to
choice-of-law clauses.  *See*, *e.g.*, *FR 8 Singapore Pte. Ltd. v.
Albacore Maritime Inc.*, 754 F. Supp. 2d 628, 636 (S.D.N.Y. 2010).

1    adequately pled an admiralty claim was a procedural question

2    governed by federal maritime law because it related to the

3    court's subject matter jurisdiction (a point not disputed by

4    the parties).  The court therefore exercised maritime

5    jurisdiction over the claim.  Second, the district court

6    held that the substantive question of whether Blue Whale had

7    pled a valid prima facie alter-ego claim was controlled by

8    English law pursuant to the contractual choice-of-law

9    provision.  Under English law, the court concluded that Blue

10    Whale had not alleged an adequate prima facie claim to

11    pierce the corporate veil, and therefore vacated the

12    attachment.[3]

---

[3] The district court also made an alternative ruling
supporting vacatur.  Under Rule B, attachment is impermissible if
a defendant can be "found" within the district.  FED. R. CIV. P.
SUPP. R. B(1)(a); *see also Aqua Stoli Shipping Ltd. v. Gardner
Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006), *overruled on
other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas
Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009).  Because HNA had registered
to do business in New York State after the district court issued
the Rule B attachment order, the district court reasoned that HNA
could now be "found" in the district and that vacatur was
appropriate under Rule E.  On this basis, the court also denied
Blue Whale's request to stay its decision and grant Blue Whale an
opportunity to obtain limited discovery and to amend its
complaint.

   Both Blue Whale and HNA recognize that the district court
erred by finding that HNA's post-attachment registration to do
business in New York State undermined Blue Whale's basis for a
Rule B attachment order.  *See ProShipLine, Inc. v. Aspen
Infrastructures, Ltd.*, 585 F.3d 105, 112 n.4 (2d Cir. 2009) ("The
time for determining whether a defendant is 'found' in the
district is set at the time of the filing of the verified

1        Supported by Amicus Curiae White Rosebay Shipping S.A.

2   ("White Rosebay"),[4] Blue Whale appeals from the district

3   court's January 11, 2013 order vacating the prior Rule B

4   maritime attachment order against HNA.

5

6                            **Discussion**

7        "We review a district court's decision to vacate a

8   maritime attachment for abuse of discretion; however, we

9   review de novo any legal determinations on which this

10  discretion rests."  *Williamson v. Recovery Ltd. P'ship*, 542

11  F.3d 43, 48 (2d Cir. 2008).  This Court has interpreted Rule

12  B to permit a plaintiff to obtain an order of attachment if

13  it can show that
14
15              1) it has a valid prima facie admiralty
16              claim against the defendant; 2) the
17              defendant cannot be found within the
18              district; 3) the defendant's property may

---

complaint that prays for attachment and the affidavit required by
Rule B(1)(b)."); *see also Marimed Shipping Inc. v. Persian Gulf
Shipping Co. Inc.*, 567 F. Supp. 2d 524, 527 (S.D.N.Y. 2008).  HNA
could not be "found" within the district for purposes of Rule B
attachment because the text of the rule itself establishes that a
defendant is "found within the district when a verified complaint
. . . [is] *filed*."  FED. R. CIV. P. SUPP. R. B(1)(a) (emphasis
added).  Thus, the district court's alternative basis for
vacating the attachment order fails as a matter of law.

[4] White Rosebay's interest in this appeal stems from its
separate commencement of two admiralty veil-piercing actions
against HNA (and other parties).

8

1    be found within the district; and 4)
2    there is no statutory or maritime law bar
3    to the attachment.

5 *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d

6 434, 445 (2d Cir. 2006), *overruled on other grounds by*

7 *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*,

8 585 F.3d 58 (2d Cir. 2009).  If a plaintiff fails to make

9 this showing when challenged under Rule E, a district court

10 must vacate the prior order of attachment.  *Id.*

11  The principal issue on appeal is whether Blue Whale

12 satisfied its burden of pleading a valid prima facie

13 admiralty claim against HNA in satisfaction of the first

14 prong of *Aqua Stoli*.  As the district court recognized, this

15 evaluation requires us to answer two questions: (1) whether

16 Blue Whale's claim against HNA sounds in admiralty; and (2)

17 whether the claim is prima facie valid.  Each of these

18 questions, in turn, necessitates determining the governing

19 body of law.  For the reasons explained below, we conclude

20 that the district court properly applied federal maritime

21 law to the procedural question of whether Blue Whale's claim

22 sounds in admiralty, and we agree that the claim does sound

23 in admiralty because it arose out of a maritime contract.

24

We also agree with the district court that the issue of
the claim's prima facie validity is a substantive inquiry.
We conclude, however, that the district court's application
of English law to this question was improper because the
charter party's choice-of-law provision does not govern Blue
Whale's collateral alter-ego claim against HNA.  Instead, we
draw on maritime choice-of-law principles to hold that
although federal common law does not govern every claim of
this nature, federal common law does apply here, primarily
because of the collateral claim's close ties to the United
States.  We remand for reconsideration by the district court
of the prima facie validity of Blue Whale's alter-ego claim
under federal common law.

**I.  The Rule B Inquiry Is Procedural in Part and Substantive in Part**

"There is a split of authority" in the Southern
District of New York on the issue of what law governs
"whether [a] plaintiff has pled a facially valid admiralty
claim . . . and the Second Circuit has not ruled on it."  *Al
Fatah Int'l Nav. Co. Ltd. v. Shivsu Canadian Clear Waters
Tech.(P) Ltd.*, 649 F. Supp. 2d 295, 299 (S.D.N.Y. 2009).
Some district courts within this Circuit presume that

1    "federal law governs all questions concerning the validity

2    of a Rule B attachment." *Harley Mullion & Co. Ltd. v.*

3    *Caverton Marine Ltd.*, No. 08-cv-5435 (BSJ), 2008 WL 4905460,

4    at *2 (S.D.N.Y. Aug. 7, 2008) (assessing whether plaintiffs

5    pled a valid maritime claim).[5]  Other district courts reason

6    that despite Rule B's "undoubted[]" status as a procedural

7    rule, "Rule B itself does not provide the basis for

8    determining the existence of a valid prima facie admiralty

9    claim," and instead, "the existence of a valid prima facie

10   claim turns on substantive law." *Al Fatah*, 649 F. Supp. 2d

11   at 300.[6]

---

[5] *See also Emeraldian Ltd. P'ship v. Wellmix Shipping Ltd.*,
No. 08 Civ. 2991 (RJH), 2009 WL 3076094, at *2-3 (S.D.N.Y. Sep.
28, 2009) (applying federal common law without discussion of
English choice-of-law clause in charter party); *Euro Trust
Trading S.A. v. Allgrains U.K. Co.*, No. 09 Civ. 4483 (GEL), 2009
WL 2223581, at *2-3 (S.D.N.Y. July 27, 2009) (agreeing that "the
better view is that federal law governs all questions concerning
the validity of a Rule B attachment," but specifically deciding
that federal law governs whether plaintiff alleged a valid
maritime claim (internal quotation marks omitted)); *Budisukma
Permai SDN BHD v. N.M.K. Prods. & Agencies Lanka (Private) Ltd.*,
606 F. Supp. 2d 391, 395-96 (S.D.N.Y. 2009) (discussing choice of
law in the context of deciding whether plaintiff had a valid
maritime claim).

[6] *See also Indagro S.A. v. Bauche S.A.*, 652 F. Supp. 2d 482,
489-90 & 490 n.9 (S.D.N.Y. 2009) (outlining the dispute and
finding that law of the contract governs whether plaintiff pled a
valid prima facie claim and federal law governs whether that
claim sounds in admiralty); *Kulberg Fins. Inc. v. Spark Trading
D.M.C.C.*, 628 F. Supp. 2d 510, 515, 518-19 (S.D.N.Y. 2009)
(endorsing "numerous courts[']" view that "existence of a valid
prima facie admiralty claim turns on the . . . law of the
contract"); *Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd.*,

*A. Whether a Claim Sounds in Admiralty Is a Procedural Question Governed by Federal Maritime Law*

Despite the divide, what is clear is that federal law controls the procedural inquiry, namely, whether a plaintiff's claim sounds in admiralty. *See id.* at 299 n.4; *Euro Trust Trading S.A. v. Allgrains U.K. Co.*, No. 09 Civ. 4483 (GEL), 2009 WL 2223581, at *3 (S.D.N.Y. July 27, 2009). This question is inherently procedural by virtue of its relationship to the courts' subject matter jurisdiction and, thus, is controlled by federal maritime law. Here, the parties do not dispute that Blue Whale's claim sounds in admiralty because it arises out of a maritime contract. The more difficult question is whether federal law also controls a court's assessment of the validity of a plaintiff's prima facie claim.

*B. Whether a Claim Is Prima Facie Valid Is a Substantive Question Governed by the Relevant Substantive Law*

If the prima facie validity component of the inquiry is

---

No. 07 Civ. 8325 (JGK), 2008 WL 3172998, at *2 (S.D.N.Y. July 31, 2008) (without discussion, applying English law pursuant to contract clause to assess whether contingent indemnity claim was ripe); *Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007) ("The existence *vel non* of a valid maritime claim for purposes of a Rule B writ of attachment turns upon the applicable substantive law, in this case the law of contract.").

12

1   procedural in nature, federal law will control; if it is

2   substantive, the relevant substantive body of law will

3   control.  The district courts in the Southern District of

4   New York have laid out the competing arguments for us.  In

5   *Harley Mullion & Co. Ltd. v. Caverton Marine Ltd.*, the court

6   explained its reasoning for finding that "the better view is

7   that federal law governs all questions concerning the

8   validity of a Rule B attachment" as follows:

9                  If, in order to comply with the
10              requirements set forth in *Aqua Stoli,* a
11              claim must be valid under the substantive
12              law that will govern the underlying
13              action, parties initiating or responding
14              to a Rule 4(E) [sic] challenge would be
15              routinely required to litigate issues of
16              foreign law and courts would have to
17              probe into the merits of the underlying
18              claim. This sort of detailed examination
19              is inappropriate at a Rule 4(E) [sic]
20              hearing as it would undermine the prima
21              facie standard and is at odds with the
22              limited inquiry contemplated by *Aqua
23              Stoli.*

24

25  No. 08-cv-5435 (BSJ), 2008 WL 4905460, at *2 (S.D.N.Y. Aug.

26  7, 2008) (internal quotation marks omitted). By contrast,

27  in *Al Fatah*, the district court rejected this

28  position because

29

30              Rule B itself does not provide the basis
31              for determining the existence of a valid
32              prima facie admiralty claim. . . . [T]he
33              existence of a valid prima facie claim
34              turns on substantive law. Where the

13

1          substantive law underlying the claim is
2          foreign, it would make no sense to
3          determine the claim's prima facie
4          validity under U.S. law.
5
6   649 F. Supp. 2d at 300.  Then-District Judge Chin further

7   explained that his "conclusion [was] not inconsistent with

8   *Aqua Stoli*[]" because even if an inquiry conducted under

9   foreign law might be "more difficult" than the same

10  assessment under United States law, "it need not necessarily

11  be any more rigorous."  *Id.*

12      We agree with Judge Chin's reasoning.  Admiralty law

13  provides the remedy; substantive law defines the right to

14  the remedy.  Assessing the prima facie validity of a claim

15  is a substantive inquiry that should be governed by the

16  relevant substantive law.  By contrast, whether a claim

17  sounds in admiralty is a procedural question, the answer to

18  which supplies the source of a court's subject matter

19  jurisdiction.

20      As the district court here recognized, the decisions

21  incorporating the reasoning in *Harley Mullion* typically do

22  so in the context of resolving a dispute over whether a

23  plaintiff has sufficiently alleged an *admiralty* claim – not

24  whether a plaintiff has pled a *valid prima facie claim*.  *See*

25  *Indagro S.A. v. Bauche S.A.*, 652 F. Supp. 2d 482, 490

14

1   (S.D.N.Y. 2009) ("Where the question is not whether the
2   claim is maritime in nature, but rather whether the
3   plaintiff has pled a 'valid' claim at all, courts in this
4   District have considered whether the plaintiff alleged a
5   prima facie claim under the substantive law governing the
6   parties' dispute."). As a result, in these cases,
7   statements to the effect that all Rule B queries are
8   procedural in nature and are governed by federal law
9   effectively constitute dicta – no one disagrees that federal
10  law controls the determination of whether a claim sounds in
11  admiralty.

12       We hold that federal maritime law governs whether a
13  claim sounds in admiralty and that the relevant substantive
14  law governs whether a plaintiff has alleged a valid prima
15  facie claim. We use substantive law to assess the prima
16  facie validity of a plaintiff's claim because substantive
17  law supplies the relevant measure for deciding whether or
18  not the claim is legally sufficient. Of course, this means
19  that courts must apply the correct substantive law – i.e.,
20  the law which defines the rights and responsibilities of the
21  parties to the dispute. This introduces the more difficult
22  question in this case: what substantive law controls the
23  validity of Blue Whale's alter-ego claim?

**II. Federal Maritime Choice-of-Law Analysis Determines the Relevant Substantive Law**

There are three approaches for evaluating what law governs Blue Whale's alter-ego claim in this case: invoking the charter party's choice-of-law provision, which specifies English law; automatically applying federal common law because the court is "examining corporate identity"; or engaging in a federal maritime choice-of-law analysis. Because we find that the charter party's choice-of-law clause does not govern this collateral alter-ego claim, we hold that federal maritime choice-of-law principles dictate the proper controlling substantive law. In this case, a maritime choice-of-law analysis yields federal common law as the relevant governing law by virtue of the claim's connection to the United States.

*A. The Contractual Choice-of-Law Clause Does Not Control Because the Alter-Ego Claim Is Collateral*

First, we reject HNA's contention, and the district court's conclusion, that the charter party's choice-of-law clause requires applying English substantive law to govern this dispute. *Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2d Cir. 1993), teaches us that choice-of-law clauses in underlying contracts are

16

"irrelevant" to assessing alter-ego claims.  In that case,
Kalb, the plaintiff, held debentures (collateral-free debts
or notes) issued by third-party corporation Circle K.  *Id.*
at 131.  After Circle K filed for bankruptcy under Chapter
11, Kalb sued as a creditor of Circle K to pierce the
corporate veil and impose liability for the debentures on
the defendant, a former controlling stockholder of Circle K.
*Id.*  Shortly thereafter, Circle K asserted its own rights to
pierce the veil against the defendant; the question in the
case was "whether a claim alleging that the debtor or
bankrupt is the alter ego of its controlling stockholder"
belonged to Circle K or Kalb.  *Id.* at 132.

In considering the choice of law in this diversity
case, we determined that it was appropriate to apply the
choice-of-law principles of the forum state (New York)
rather than relying on the choice-of-law clause in the
debentures.  *Id.*  We noted that "[t]he choice of law
provisions in the debentures [were] irrelevant [because t]he
issue is the limited liability of shareholders of a
corporation – not Circle K's obligations under the
debentures."  *Id.*

Similarly, here the issue is HNA's legal status as an
alter ego of Development, not the obligations under or

17

subsequent alleged violations of the charter party between Development and Blue Whale.  Blue Whale's claim against HNA sounds in admirality because it arose from this maritime contract – however, the substance of the attachment claim concerns whether HNA is an alter ego of Development.  This corporate identity inquiry is indeed distant from the dispute over the charter party's provisions regarding the transport of iron ore.  For this reason, we find that "the issue of piercing the corporate veil is collateral to the contract, and thus this Court is not bound by the choice of law provision." *United Trade Assocs. Ltd. v. Dickens & Matson (USA) Ltd., Inc*., 848 F. Supp. 751, 759 (E.D. Mich. 1994); *see also Wehlage v. EmpRes Healthcare Inc*., 821 F. Supp. 2d 1122, 1127-28 (N.D. Cal. 2011); *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and Trade Servs*., Inc., 295 F. Supp. 2d 366, 385-86 (S.D.N.Y. 2003) (determining that action to enforce judgment was "in no way connected to or related to the performance of the shipment contracts" and that arbitration clause did not govern).[7]

---

[7] There are a number of cases that indicate that had Blue Whale prevailed at the London arbitration proceeding in advance of bringing an action for attachment or enforcement in the United States, federal common law and not English law would govern the court's evaluation of HNA's alleged alter-ego status.  *See*, *e.g.*, *Bridas S.A.P.I.C. v. Gov. of Turkmenistan*, 345 F.3d 347, 353,

*B. Federal Common Law Does Not Apply Automatically for "Examining Corporate Identity"*

Second, we reject the proposition advanced by Blue Whale and White Rosebay that federal common law *automatically* governs the alter-ego claim.  Blue Whale and Amicus Curiae White Rosebay cite numerous cases for the proposition that

> courts in this Circuit have consistently held . . . [that] '[f]ederal courts sitting in admiralty must apply federal common law when examining corporate identity.'

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 507-08 (S.D.N.Y. 2012) (quoting *In re Holborn Oil Trading Ltd.*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991)).[8]  However, many of these cases, as well as matters

---

358-60 (5th Cir. 2003) (remanding after applying federal common law instead of contractually-specified English law to determine whether Government of Turkmenistan was subject to arbitration, and thus liable for arbitration award, as alleged alter ego of contracting party) (*cited favorably in Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation*, 361 F.3d 676, 686 (2d Cir. 2004)).

[8] *See also Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) (applying federal common law to evaluate plaintiff's claim to enforce arbitration award against alleged alter-ego defendants); *Emeraldian*, 2009 WL 3076094, at *2-3 (applying federal common law to assess validity of plaintiff's prima facie alter-ego maritime claim without discussing applicability of English choice-of-law provision); *Arctic Ocean Int'l Ltd. v. High Seas Shipping Ltd.*, 622 F. Supp. 2d 46, 53 (S.D.N.Y. 2009) (same).

cited more broadly in support,[9] are focused principally on the scope of courts' admiralty jurisdiction, rather than on the source of substantive law.  Admiralty jurisdiction and federal maritime law need not go hand-in-hand, *see*, *e.g.*, *Lauritzen v. Larsen*, 345 U.S. 571 (1953), even in the context of examining corporate identity.

It appears that this Court's decision in *Kirno Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980) (per curiam), is at the root of the principle that federal common law governs the analysis of corporate identity.  *Kirno Hill* did not involve Rule B, a contract specifying choice of law, international parties or contracts, or, in fact, any quarrel over choice of law.  Instead, the case centered around a dispute over personal liability for obligations under a charter party.  *Id.* at 984.  We applied federal maritime law, "which is the law we apply in an admiralty case," to

---

[9] *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684 (1950); *Williamson*, 542 F.3d at 49-50; *see also Williamson v. Recovery Ltd. P'ship*, No. 06 Civ. 5724 (LTS)(FM), 2007 WL 102089, at *2 (S.D.N.Y. Jan. 16, 2007) ("The choice of law clauses, whatever their significance in the ultimate determination of the merits of the dispute, do not divest the federal court of subject matter jurisdiction."); *see also Budisukma*, 606 F. Supp. 2d 391 (adopting *Harley Mullion* analysis to decide primary issue of whether plaintiff's claim was maritime in nature and not specifying whether reasoning for applying federal common law, instead of English law, to assess validity of alter-ego claims was on a similar basis).

1   determine whether an undisclosed principal was bound by

2   contracts made by an agent acting within his authority.  *Id.*

3   at 985.

4        Subsequent cases citing *Kirno Hill* for the proposition

5   that federal common law dictates whether or not a maritime

6   plaintiff has sufficiently pled a claim to pierce the

7   corporate veil tend to proceed along one of two lines.

8   First, there are cases like *Clipper Wonsild Tankers Holding*

9   *A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504

10  (S.D.N.Y. 2012), opining that courts must choose between

11  state law and federal common law.  In *Clipper*, alleged

12  alter-ego defendants argued that plaintiffs' Rule B claims

13  should be governed by Texas law because of the parties'

14  diversity and defendants' status as Texas corporations.  *Id.*

15  at 506-07.  The district court disagreed because plaintiffs

16  had expressly (and properly) invoked the court's admiralty

17  jurisdiction since a charter party lay at the center of the

18  dispute.  *Id.* at 507-08.  This result strikes us as correct.

19  When the choice is between state law and federal common law,

20  the federal interest in maintaining uniformity in the

21  quintessentially federal realm of admiralty supersedes any

22  competing interest in applying state law.  *See generally Am.*

23  *Dredging Co. v. Miller*, 510 U.S. 443 (1994).

21

1    Second, there are Rule B attachment cases in which

2    district courts must grapple with foreign parties' disputes

3    that arose (or sometimes sank) in foreign waters.  In *Arctic*

4    *Ocean International, Ltd. v. High Seas Shipping Ltd.*, 622 F.

5    Supp. 2d 46 (S.D.N.Y. 2009), for example, a Russian

6    plaintiff-company secured a Rule B attachment order in the

7    Southern District of New York against a Marshall Islands

8    defendant-company and an alleged alter-ego Canadian

9    defendant-company.  *Id.* at 47-48.  In evaluating the alleged

10   alter ego's attack on the attachment order,[10] the district

11   court assessed the prima facie validity of plaintiff's

12   alter-ego claim under federal common law.  *Id.* at 53-56.

13   The district court applied federal common law instead of

14   Russian law, Marshall Islands law, Canadian law or English

15   law (which was specified by the charter party's arbitration

16   choice-of-law provision, *id.* at 48) because "federal courts

17   sitting in admiralty have tended to apply federal maritime

18   common law," *id.* at 53 (citing *In re Holborn*, 774 F. Supp.

19   at 844).

---

[10] The alleged alter-ego defendant moved to dismiss the
complaint under Rules 12(b)(2) and 12(b)(6) rather than
challenging the attachment under Rule E(4)(f) because no property
had actually been attached in the approximately eleven months
that the Rule B order had been in force.  *Arctic Ocean*, 622 F.
Supp. 2d at 50.  However, as the district court recognized,
defendant's arguments "would have similar force at a Rule E(4)(f)
hearing."  *Id.*

1    Although the district court may well have reached the

2    correct result in *Arctic Ocean*, we do not believe that *Kirno*

3    *Hill* (or its progeny) compels courts "examining corporate

4    identity" to apply federal common law.  That said, we

5    recognize that district courts frequently have found value

6    in using federal common law to evaluate the validity of

7    collateral claims in Rule B attachment proceedings.  Our aim

8    today is to clarify that the decision of which body of law

9    to apply should be the product of a maritime choice-of-law

10   analysis.

11        *C. Maritime Choice-of-Law Analysis Shows that Federal*
12        *Common Law Controls Because United States Law Has the*
13        *Strongest Connection to the Relevant Transaction*
14
15        The Supreme Court first announced the maritime

16   conflicts-of-law test in *Lauritzen v. Larsen*, 345 U.S. 571

17   (1953).  "The rule of *Klaxon Co. v. Stentor Electric Mfg.*

18   *Co.*[], under which a federal court exercising its diversity

19   jurisdiction looks to the choice-of-law doctrine of the

20   forum state, does not govern suits invoking the court's

21   admiralty jurisdiction."  *Itel Containers Int'l Corp. v.*

22   *Atlanttrafik Exp. Serv. Ltd.*, No. 86 Civ. 1313 (RLC), 1988

23   WL 75262, at *2 (S.D.N.Y. July 13, 1988).  Thus, when

24   parties properly invoke admiralty jurisdiction, courts apply

25   federal maritime choice-of-law rules.  *Id.*

23

1     In *Lauritzen*, a Danish seaman brought suit in the

2   Southern District of New York under the Jones Act, 46 U.S.C.

3   § 688, alleging that he was negligently injured aboard a

4   ship of Danish flag and registry while in Havana harbor.

5   345 U.S. at 573.  The ship was owned by a Danish citizen,

6   and the injured seaman had signed the ship's articles

7   providing that disputes would be governed by Danish law.

8   *Id.*  Nevertheless, he sought to invoke United States law.

9   *Id.*

10     Recognizing that "[m]aritime law . . . has attempted to

11   avoid or resolve conflicts between competing laws by

12   ascertaining and valuing points of contact between the

13   transaction and the states or governments whose competing

14   laws are involved," *id.* at 582, the Supreme Court laid out a

15   multi-factor choice-of-law test,[11] "[t]he purpose of [which]

---

[11] Supplemented by subsequent case law, the non-exhaustive list of factors includes: "(1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations." *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 90 (2d Cir. 1996) (citing *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959); *Lauritzen*, 345 U.S. at 583-92).  Though the *Lauritzen* factors speak more directly to tort claims, a modified framework may be invoked in contract actions.  *See Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026-27 (2d Cir. 1973); *see also Itel Containers*, 1988 WL 75262, at *2.

24

is to assure that a case will be treated n [sic] the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum," *id.* at 591. In *Lauritzen*, the balance of factors clearly pointed to application of Danish law: the injured seaman had minimal contacts with the United States beyond the intangible – his desire to invoke this nation's more favorable maritime tort law. *Id.* at 592.

Here, by contrast, Blue Whale initiated this proceeding in the United States, and specifically in the Southern District of New York, because that is where HNA owns property. Blue Whale did not invoke the Southern District of New York's admiralty jurisdiction by serendipity – the presence of HNA's property enabled this action and, along with it, the application of federal maritime law. Furthermore, the basic tenet upon which *Lauritzen* is premised will be satisfied here by using federal common law because its application reflects an implicit "resol[ution of] conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Id.* at 582.

1    As is often the case in admiralty, we deal here with

2    multi-national foreign parties locked in dispute as the

3    result of an alleged breach of an international shipping

4    contract.  Indeed, part of the reason we authorize maritime

5    attachment is the "peripatetic" nature of maritime parties,

6    the "transitory" status of their assets, *Aqua Stoli*, 460

7    F.3d at 443, and the need for parties to obtain security

8    "[i]n a world of shifting assets, numerous

9    thinly-capitalized subsidiaries, flags of convenience and

10   flows of currencies," *Navalmar (U.K.) Ltd. v. Welspun*

11   *Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399, 404

12   (S.D.N.Y. 2007) (citing *Aurora Maritime v. Abdullah Mohamed*

13   *Fahem & Co.*, 84 F.3d 44 (2d Cir. 1996)).

14   This particular case arose from a charter party between

15   a Chinese company, Development, and another foreign company,

16   Blue Whale, to ship iron ore from Brazil to China on a

17   Liberian vessel.  This narrative yields several potential

18   sources of law; none have a particularly strong connection

19   to the transaction.  The facts here contrast strongly with

20   the facts in *Lauritzen*, where all parties, the ship, and the

21   contract itself exhibited strong ties to Denmark.  345 U.S.

22   at 573.

23

26

1    Importantly, however, the relevant "transaction" in

2    this case is *not* Development's alleged failure to comply

3    with the charter party – it is Blue Whale's claim to pierce

4    the corporate veil.  The district court in this Rule B

5    action is charged only with determining whether Blue Whale

6    stated a prima facie valid alter-ego claim against HNA in

7    furtherance of its motion to attach HNA's property in New

8    York.  Accordingly, United States law has the strongest

9    "points of contact" with this claim by virtue of the

10   location of HNA's property, Blue Whale's corresponding

11   choice of forum and the unavailability of an alternative

12   forum, and the absence of a dominant foreign choice of law.

13       On a final note, we recognize the value of simplifying

14   the judicial process required for Rule B attachments and

15   Rule E motions to vacate when feasible.  *See generally Aqua*

16   *Stoli*, 460 F.3d at 443-44.  As we have articulated, this

17   does not excise the judicial obligation to apply the

18   governing substantive law to assess the prima facie validity

19   of a Rule B admiralty claim when challenged in a Rule E

20   proceeding.  But here, for the reasons discussed, we

21   identify federal common law as the proper substantive body

22   of law to govern Blue Whale's alter-ego claim against HNA.

23   This follows from the ideas underpinning the *Lauritzen*

27

1  choice-of-law analysis and from our aim of ensuring

2  uniformity in admiralty law whenever possible.  Accordingly,

3  we vacate the district court's order and remand for

4  reconsideration of the prima facie validity of Blue Whale's

5  Rule B alter-ego claim under federal common law.  *See*

6  *Williamson*, 542 F.3d at 53; *Clipper*, 851 F. Supp. 2d at 509-

7  10.

8  **Conclusion**

9      For the foregoing reasons, the order of the district

10 court is hereby VACATED and REMANDED.